UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**Michael Picard**,
*Plaintiff*

*v.* No. 16-cv-_____

**Patrick Torneo**, **John Jacobi**, and **John Barone**,
Defendants

## Complaint

1. This suit challenges the actions of three Connecticut state troopers who, acting under color of state law, detained, searched, and charged Michael Picard for protesting the government. The defendants also energetically interfered with Mr. Picard's right to receive information when they confiscated his camera and made efforts to prevent him from recording their illegal acts with his cell phone. Through their actions, the state troopers violated Mr. Picard's rights under the First and Fourth Amendments to the United States Constitution.

### *Jurisdiction*

2. The United States District Court has jurisdiction over this dispute because the plaintiff's claims arise under the law of the United States. 28 U.S.C. § 1331.

3. Venue is proper in the District of Connecticut because all of the events giving rise to the plaintiff's claims transpired within this district. 28 U.S.C. § 1391(b)(2).

### *Parties*

4. Plaintiff Michael Picard is a United States citizen and a resident of Connecticut.

5. Mr. Picard has a keen interest in the subjects of privacy and federal constitutional law.

1

6. He occasionally expresses his opinions on those subjects by protesting driving under the influence (DUI) checkpoints put up by police around the Hartford region. Mr. Picard believes that such checkpoints are contrary to the Fourth Amendment, and a waste of public money.

7. Over the years as he has conducted his protests, he has become known to state and local police officers around Hartford.

8. Mr. Picard finds out about upcoming checkpoints by consulting publicly available information online, such as announcements on police departments' websites and social media.

9. Mr. Picard frequently photographs and video records the goings-on at his checkpoint protests, and frequently disseminate the resulting images and videos online so as to inform the public about how checkpoints operate.

10. Defendant John Barone was and is, at all time relevant to this suit, employed by the Division of State Police within the Connecticut Department of Emergency Services and Public Protection, with the job title of trooper first class.

11. Defendant Patrick Torneo was and is, at all time relevant to this suit, employed by the Division of State Police within the Connecticut Department of Emergency Services and Public Protection, with the job title of master sergeant.

12. Defendant John Jacobi was and is, at all time relevant to this suit, employed by the Division of State Police within the Connecticut Department of Emergency Services and Public Protection, with the job title of sergeant.

13. At all times relevant to this action, the defendants were on duty for their employer, and were wearing Connecticut State Police uniforms, badges, and pistols.

14. At all times relevant to this action, the defendants were each a "person" as that term is used by 42 U.S.C. § 1983.

### *The Site of Mr. Picard's September 2015 Protest*

15. On the evening of September 11, 2015, Connecticut state troopers were operating a DUI checkpoint on the Interstate 84 slip road in West Hartford.

16. Mr. Picard arrived at the intersection of Park Road and the long slip road leading to I-84 at approximately 6:45 PM to demonstrate against the checkpoint.

17. At all times during his protest, Mr. Picard stood on the gore where Park Road intersects the long slip road onto the interstate, several hundred feet north from the checkpoint.

18. A gore is a small, often triangular, piece of land, that can be used to merge two lanes of traffic into one.

19. Mr. Picard reached the gore by crossing Park Road from its north side.

20. Park Road is not a limited-access road. It has sidewalks paralleling it and has no prohibitions against pedestrians walking alongside it.

21. The gore on which Mr. Picard was standing has its long edge running east-west along Park Road, and its two short edges curve into a point facing south, the direction that traffic heading towards I-84 flows.

22. The gore serves to merge traffic turning southerly off of Park Road and onto the long slip road to Interstate 84. *See* Exhibit A.

23. Exhibit A to this complaint is a fair and accurate representation of the intersection at which Mr. Picard protested.

24. At no time did Mr. Picard protest by standing in either the Park Road roadway, or

the roadway of the I-84 slip road lying to the south of the gore.

25. The I-84 slip road to the south of the gore becomes a limited-access road, but the sign demarcating it as one lies several hundred feet south of the gore on which Mr. Picard protested.

26. The gore on which Mr. Picard stood is raised above the surrounding pavement, and has a telephone pole on its long edge running along Park Road.

27. In the center of the gore is a large green reflective road sign bearing the red and blue Interstate 84 shield, an arrow pointing towards the access road, and the words "Hartford" and "Waterbury." The road sign is mounted on two metal poles, with the top of the sign about ten feet above the surface of the gore.

28. The edges of the gore are marked by a number of yellow reflectors mounted on steel posts, and the gore is surrounded by standard-height granite curbs on all three sides. *See* Exhibit B.

29. Exhibit B to this complaint is a fair and accurate representation of the gore on which Mr. Picard stood during his protest.

30. At all times relevant to this suit, at least one state police vehicle was parked on or next to the gore, with its red and blue lights flashing.

### *Mr. Picard's Protest, and Attempts to Record His Treatment*

31. At all times during his protest, Mr. Picard held a three-foot by two-foot yellow sign reading "Cops Ahead: Keep Calm and Remain Silent." He displayed the sign to motorists on Park Road who were approaching the gore from both directions.

32. At least one state police officer and one West Hartford police officer drove by Mr. Picard as he protested, and neither stopped to engage him.

4

33. However, weeks in advance of Mr. Picard's protest, an employee of the Hartford police department who is familiar with Mr. Picard's protest activities telephoned the state police and warned them that Mr. Picard would almost certainly protest the September 11th checkpoint.

34. The Hartford police officer told the state police that Mr. Picard was the lawful owner of a pistol, that Mr. Picard is harmless, and that Mr. Picard habitually video-records all of his interactions with the police for later dissemination.

35. After Mr. Picard had been protesting for approximately one and a half hours on the night of September 11th without incident, defendant Barone walked over to Mr. Picard.

36. At no time was Barone's gun drawn, and he did not give Mr. Picard any instructions to put his hands in the air.

37. Defendant Barone announced to Mr. Picard that "someone called in" a complaint about a man "waving a gun and pointing it at people."

38. There was never any such complaint to the police that evening.

39. When Barone approached him, Mr. Picard was holding a digital camera in his left hand, with his hand between the camera and its hand strap.

40. Defendant Barone did not ask or order Mr. Picard to put the camera down.

41. Defendant Barone swatted the camera out of Mr. Picard's hand and onto the sidewalk, where its battery dislodged. Barone did not explain to Mr. Picard why he had attempted to destroy the camera.

42. Defendant Barone then pointed to the pistol that Mr. Picard was wearing in a hip holster, and theatrically shouted to the other defendants, "I've got a gun!"

43. Barone pat-frisked Mr. Picard, seized his pistol by removing it from the retention

holster on Mr. Picard's hip, and took Mr. Picard's pistol permit out of Picard's pants pocket.

44. At all times relevant to this action, Mr. Picard's pistol permit was valid. Mr. Picard's possessing the permit, and the dates printed on the face of the permit, were prima facie evidence that he lawfully possessed a pistol.

45. At the protest scene on the night in question, Mr. Picard did not once remove his pistol from its holster. The only time the pistol came out of its holster was when defendant Barone removed it.

46. Defendant Barone did not handcuff Mr. Picard, tell him that he was being detained, place him under arrest, or instruct him to sit down or stay in one place.

47. Instead, Barone took Mr. Picard's pistol and pistol permit to the edge of the gore, where defendant Torneo was sitting in the driver's seat of his state police cruiser. Defendants Jacobi and Barone stood outside Torneo's window and discussed Mr. Picard.

### *The Defendants Continue to Interfere With Mr. Picard's Recording*

48. While the defendants were at Torneo's cruiser, Mr. Picard picked his camera up off of the ground, reinserted the battery, and turned it back on to see if it was still functional after Barone threw it to the ground.

49. After Mr. Picard raised the camera in his left hand and aimed it at the defendants as they conversed, defendant Barone quickly walked back over to Mr. Picard.

50. Defendant Barone told Mr. Picard that "it's illegal to take my picture," and grabbed the camera.

51. Mr. Picard asked for the camera back and told Barone that he objected to the

seizure of the camera, but Barone told him that "it's illegal to take my picture," because he claimed that Mr. Picard did not "get any documentation [that] I'm allowing you to take my picture." *See* Ex. C at 00:00-00:22.

52. To assist the parties in hearing their interactions as recorded by the camera, Mr. Picard has reduced the background noise in Exhibit C by de-emphasizing the nocturnal chorus of insects, as well as the loud music from some passing cars. Exhibit C is unaltered in length or content; the sound processing has not omitted anything from, or added anything to, the depictions of the September 11th protest recorded by the exhibit.

53. Exhibit C is a fair and accurate representation of that portion of the September 11th protest captured on the recording.

54. Defendant Barone also told Mr. Picard that taking pictures was illegal because Mr. Picard was not on public property, as Picard had been insisting, but because Picard was purportedly "on state property" and therefore lacked the ability to record the defendants performing their job duties.

55. Barone took the camera back to the other defendants and announced to them, "I got the camera."

56. Barone placed the camera on the light bar mounted on the roof of Torneo's cruiser, pointed skyward, without turning it off.

57. Neither defendant Jacobi nor defendant Torneo objected to the seizure of the camera, and neither defendant took any action to return the camera to Mr. Picard until after their encounter with him terminated.

58. Unbeknownst to the defendants, Mr. Picard had been using the camera to record video and audio, not still photographs, and the camera continued recording until

7

it was returned to Mr. Picard.

59. The defendants left Mr. Picard's camera on top of Torneo's cruiser while they discussed what they would do next. They eventually returned it to Mr. Picard near the end of their encounter with them, but at no time did they examine it, search it, or treat the camera as evidence in any way.

60. In an attempt to document what was happening to him, Mr. Picard pulled his smartphone out of his pocket and began recording video on that device. He walked around the gore, recording the scene, and pointed the phone at the license plates of the defendants' state police vehicles.

61. Defendant Torneo saw Mr. Picard doing this, and turned on and aimed his cruiser's spotlight directly at the smartphone in an attempt to foil its recording the license plate numbers by flooding the device with bright, white light.

***The Defendants Fabricate Criminal Charges Against Mr. Picard***

62. At Torneo's cruiser, the defendants checked Mr. Picard's pistol permit and confirmed what they already knew: it was valid.

63. Nonetheless, Torneo instructed one of the defendants to "have that Hartford lieutenant call me," so that Torneo could check if Mr. Picard "has any grudges."

64. A "grudge" is police slang for a personal bias held by a police officer against a person because of a dispute or past display of disrespect towards the police.

65. The defendants' inquiry did not uncover any "grudges" against Mr. Picard.

66. Nonetheless, Barone asked the other defendants, "do you want me to punch a number on this one? We gotta cover our ass."

67. "Punch[ing] a number" is police slang that refers to opening an investigation in

8

the electronic case management system and assigning it a case number. "Punching a number" memorializes police activity and create an electronic trail that can later be used to justify police actions.

68. The defendants "punched a number" and opened an investigation into Mr. Picard.

69. Defendant Jacobi ordered Barone to retrieve his state police truck from several hundred feet away, where it had been parked at the checkpoint.

70. Meanwhile, defendants Torneo and Jacobi continued their conversation about Mr. Picard.

71. The two discussed an August 2015 protest at the state capitol that Mr. Picard had organized in support of the right to bear arms. Mr. Picard had never met defendants Jacobi and Torneo prior to September 11, 2015, and did not mention the August protest to them that evening.

72. Defendants Jacobi and Torneo discussed whether they could charge Mr. Picard with any crimes, and one of the two suggested that any charge would suffice, saying, "let's give him something."

73. Jacobi suggested to Torneo that "we do simple trespass, we do reckless use of the highway, and creating a public disturbance." Torneo agreed.

74. Defendant Torneo said that the defendants should issue Mr. Picard a public disturbance charge, "*then* we claim that in backup we had *multiple* [motorists] stopped to complain about" a man waving a gun, "but that no one wanted to stop and give a statement." Torneo emphasized the words "then" and "multiple" when speaking, as if formulating the defendants' cover story aloud.

75. Defendant Jacobi agreed, saying "yup, yup" and "okay" in response to Torneo's

suggestion of how to present the fabricated charge against Mr. Picard.

76. Defendants Torneo and Jacobi also discussed whether they should charge Mr. Picard with walking in the road for his presence on the gore. The two agreed to do so.

77. When defendant Barone returned to the discussion, the three discussed how many criminal infraction tickets Mr. Picard was going to receive, eventually settling on two.

78. The tickets charged Mr. Picard with violating Conn. Gen. Stat. § 53-182 (use of a highway by a pedestrian) for standing on the gore, and with violating Conn. Gen. Stat. § 53a-181a (creating a public disturbance) for carrying an "exposed loaded side arm in plain view of passing motorists" and because some motorists "complained [that Picard] was holding a weapon in his hand." Attached as Exhibit D.

79. After Mr. Picard had been given the tickets, defendant Torneo drove away from the scene with Mr. Picard's camera still on the light bar of his cruiser. It fell onto the hood of the car, and Torneo stopped and instructed defendant Jacobi to give the camera back to Mr. Picard. Jacobi did so.

80. Defendant Jacobi told Mr. Picard that he should not display his pistol on his hip holster, even though it was lawful for Mr. Picard to do so. Jacobi then repeated the fictitious story that "multiple motorists" complained about Mr. Picard removing his gun from its holster.

81. The defendants ordered Mr. Picard off the gore and terminated their encounter with him approximately an hour after it began. The defendants told Mr. Picard that he could protest in a spot on the Park Road sidewalk that was some distance

10

away and far less visible to motorists.

82. Because of the defendants' order to him to leave the gore and go to a place that he considered to be much less visible, Mr. Picard ended his protest and returned home.

### *The Fabricated Criminal Charges are Dismissed*

83. The tickets that the defendants issued to Mr. Picard initiated a criminal prosecution against Mr. Picard in the Connecticut Superior Court.

84. On May 4, 2016, after the superior court granted Mr. Picard's motion for a bill of particulars, prosecutors filed a long-form information against Mr. Picard that omitted the public disturbance charge against him, thereby dismissing it.

85. On July 15, 2016, prosecutors entered a nolle prosequi on the remaining charge against Mr. Picard, for negligent use of the highway.

86. That action terminated the criminal proceeding against him, in his favor.

### Count 1:   Violation of Mr. Picard's First Amendment Right to Receive and Memorialize Information

87. By interfering with Mr. Picard's ability to use his camera and smartphone, the defendants violated Mr. Picard's First Amendment right to receive and memorialize information.

11

**Count 2:   Violation of Mr. Picard's Fourth Amendment Right Against Warrantless Seizure of his Property**

88. By seizing Mr. Picard's camera and detaining it without it without a search warrant or any reasonable suspicion that the camera contained evidence of a crime or was itself contraband, the defendants violated Mr. Picard's Fourth Amendment right against warrantless seizure of his possessions.

**Count 3:   Retaliation Against Mr. Picard for His Expression**

89. By detaining, searching, confiscating his belongings, and charging Mr. Picard with fabricated criminal infractions, the defendants violated Mr. Picard's First Amendment right to document and protest government activity.

**Request for Relief**

90. Therefore, Mr. Picard is entitled to have this Court:

    (a) enter judgment in his favor on all counts;

    (b) award him damages, and punitive damages, for the defendants' violations of his rights;

    (c) order the defendants to reimburse him his reasonable costs and attorneys' fees in conformance with 42 U.S.C. § 1988; and

    (d) order all other relief as the Court deems appropriate.

91. Mr. Picard claims a trial by jury on all disputes so eligible.

*(signatures follow on next page)*

|  |  |
|---|---|
| ____/s/ Dan Barrett_____ | ____/s/  Joseph R. Sastre_____ |
| Dan Barrett (# ct29816) | Joseph R. Sastre (# ct28621) |
| ACLU Foundation of Connecticut | The Law Office of Joseph R. Sastre, LLC |
| 765 Asylum Avenue, 1st Floor | 67 Chestnut Street |
| Hartford, CT 06105 | Bristol, CT 06010 |
| (860) 471-8471 | (860) 261-5643 |
| e-filings@acluct.org | joseph.sastre@gmail.com |

September 15, 2016
*Counsel for Mr. Picard*

13

# Exhibit A
satellite photo of Park Road gore



# Exhibit B
street level photo of Park Road gore



# Exhibit C
video recording from camera seized by the defendants
(filed on disc with the clerk's office, in both QuickTime and MP4 file formats)

# Exhibit D
criminal infraction tickets issued by the defendants

## COMPLAINT TICKET 

Y134404-2

Agency Case No.: 1500544433

### The undersigned officer complains that:

On: 09/11/2015  At: 20:40  In: WEST HARTFORD  Town Code: T155
Name: PICARD, MICHAEL D
Address: ███████, East Hartford, CT 06118  Agency Code: N650
DOB: ███████ 1988  Race: W  Sex: M  Hispanic: NO

### License and Motor Vehicle

Driver's Lic No.: ███████  Boating Certificate: NO  State: CT
Registration No.: ███████  Boat: NO  State:
Make/Model/Style:  Color:  Year:
Owned By: PICARD, MICHAEL D  Address: ███████ East Hartford CT

On or Near: 00000 RAMP 43 I 84 E-W (WEST HARTFORD, T155)
Truck (14-260n): NO  DOT No.:  Over 15% Overweight: NO  18,000 lbs. or more: NO
Comm. Dr. Lic.: NO  Comm. Veh.: NO  HazMat: NO
Speed (if applicable):  Actual:  Posted Limit:
Road: D  Traffic: H  Visibility: D  Area: LAH

### did commit the following Infraction(s)/Violation(s)

| Description | Counts | Statute/Ordinance | Amount |
|---|---|---|---|
| 1. 53-182 - Reckless use of highway by pedestrian | 1 | 53-182 | $75.00 |
| 2. 53a-181a - Creating a public disturbance | 1 | 53a-181a | $103.00 |
| 3. | | | $.00 |
| 4. | | | $.00 |
| 5. | | | $.00 |
| 6. | | | $.00 |

$178.00   Answer Date: 10/9/2015   Amount Due: $178.00

Shield No.: 0773   Police Dept. Connecticut State Police   Photo ID: Yes   /TFC BARONE/
Signature (Officer):

### OFFICER'S REPORT TO PROSECUTING AUTHORITY
*Note facts and circumstances in addition to those recorded on face of complaint:*

person was standing in the gore area to i84 east and west bound. he was holding a sign saying cops ahead with an exposed loaded side arm in plain view of passing motorists.. several motorists complained about the exposed weapon some complained he was holding a weapon in his hand.