UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**Michael Picard**,
*Plaintiff*

*v.*                                                                     No. 16-cv-1564

**Patrick Torneo**, **John Jacobi**, and **John Barone**,                 April 12, 2019
*Defendants*

### Plaintiff's Motion for Partial Summary Judgment

Plaintiff Michael Picard spent an evening in September 2015 protesting on a roadside in West Hartford before being set upon by the defendant state employees who objected to his scrutiny and criticism of the police.  The defendants forbade him from photographing them doing their jobs in public, confiscated his camera, and laid criminal charges against him.  Because the undisputed material facts show that the defendants violated Mr. Picard's First and Fourth Amendment rights in doing so, judgment should enter in Mr. Picard's favor on Counts One and Two of his complaint.

### 1.     The Facts

On the evening[1] of September 11, 2015, Mr. Picard and a friend, Steve Schafer, stood on the side of Park Road in West Hartford, Connecticut, protesting a DUI checkpoint operated by the state police.[2]  They were protesting because they believe that such checkpoints violate the motoring public's right to privacy and/or freedom of movement.  Picard and Schafer had each protested checkpoints before, and knew that

---

1   Plaintiff's D. Conn. Local R. 56(a)(1) Stmnt. of Undisputed Facts # 1.
2   *Id.* # 2.

**oral argument requested**

the checkpoint would be held at that location on that night because Connecticut police advertise times and locations on Facebook.

Both protesters had signs with them.  Mr. Picard had two: one read "Cops Ahead," while the other read "Stay Calm and Remain Silent."[3]  Mr. Picard's purpose in protesting was to signal disagreement with the use of DUI checkpoints, "to educate the public," and to spur people to "see the sign and . . . later hopefully have a discussion about it with someone."[4]

Both protesters also had electronics with them that evening capable of recording video.  Schafer had a smartphone, and Mr. Picard had a smartphone as well as a standalone camera.[5]  They carried recording devices with them in the event that any police approached them, because their past experience was that the police tended to slant their recitations of the facts.[6]  They did not video record portions of their protests outside of instances in which the police approached them.[7]

Mr. Picard also carried a pistol with him that night, in plain view in a holster on his right hip.[8]  He had his valid pistol permit with him.[9]

### 1.1    The Site of Mr. Picard's Protest

Mr. Picard protested where a long Interstate 84 on-ramp runs south from Park Road, an east-west street.  Mr. Picard stood on a raised triangle on the south side of Park Road.[10]  The triangle on which Mr. Picard was protesting had one edge running

---

3   Pl.'s Stmnt. Undisputed Facts # 3.
4   Picard 22:15-24.
5   Pl.'s Stmnt. Undisputed Facts # 4.
6   *See* 1 Schafer 129:15-16 (explaining that recording the police "[c]reates accountability").
7   1 Schafer 101:18-20; Picard 56:22-57:3.
8   Pl.'s Stmnt. Undisputed Facts # 5.
9   *Id*. # 6.
10   *Id*. # 7.

straight east-west along Park Road, and two edges curve into a point facing south towards the I-84 on-ramp.[11]



From the air, the triangle looked like this:[12]



The triangle was raised above the pavement and surrounded by curbing.  Its edges were marked by yellow reflectors mounted on steel posts, and it had a telephone pole on its long edge running along Park Road.[13]  In the center of the triangle was a large green reflective road sign bearing the red and blue Interstate 84 shield, an arrow pointing towards the access road, and the words "Hartford" and "Waterbury."  The road sign was mounted on two metal poles, with the top of the sign about ten feet above the surface of the triangle on which Mr. Picard stood.

_____

11  Pl.'s Stmnt. Undisputed Facts # 8.
12  Complaint [ECF # 1] app. A; Pl.'s Stmnt. Undisputed Facts # 9.
13  Pl.'s Stmnt. Undisputed Facts # 10

From the street, the triangle looked like this[14]:



While protesting, Mr. Picard stayed along the long edge of the island, walking no further right on the photo above that the leftmost post of the I-84 sign.[15]  He did not set foot off the triangle until after the defendants forced him to leave it.[16]  Mr. Schafer stood further down Park Road on the same side, just west of the island.[17]

### 1.2    The Checkpoint

A couple of hundred feet away on the ramp, the DUI checkpoint awaited motorists.  Like most state police DUI checkpoints, the one that night was laid out with traffic cones funneling traffic past a line of police officers, who initiated conversations with drivers in order to detect signs of intoxication.[18]  The police were also looking for

---

14  Complaint [ECF # 1] app. B; Pl.'s Stmnt. Undisputed Facts ## 11, 12.  The relevant area of Park Road has since been reconfigured; Mr. Picard will refer to their features as they existed during his protest.
15  Pl.'s Stmnt. Undisputed Facts # 13.
16  *Id.* # 14.
17  Picard 54:23-55:8; 1 Schafer 40:17-41:14.
18  Depo. of Curtis Booker [Ex. 5] 23:16-22.

motor vehicle code violations,[19] since in the words of one employee who has worked dozens of them, "it ends up being mostly motor vehicle traffic violations at a DUI checkpoint and, you know, one or two drunks."[20]

If seen from a bird's eye that evening, the first police officer that motorists would have encountered stood about 120 feet south of Park Road where Mr. Picard was protesting.[21] That supervisor directed traffic down to the waiting troopers in groups of six for parallel interrogations.[22]

Downstream from the supervisor on the side of the ramp was a state police employee in his car, watching as traffic snaked through the checkpoint. As vehicles passed, he typed their license plates into his computer to check for expired registrations and other potential problems.[23] If a car had a problem meriting further investigation, he would call out for colleagues downstream to detain the car.[24] Cars were detained on the shoulders of the I-84 ramp, which were quite wide and allowed plenty of space to pull a vehicle out of line onto a protected area for purposes of further investigation or ticket-issuing without interrupting the flow of traffic.[25] When one police officer pulled a car out of line for additional interrogation or ticketing, another police officer would take over standing next to the traffic cones and conversing with motorists.[26] Once the police

---

19   Booker 31:4-15.

20   Depo. of Jeffrey Duda [Ex. 6] 13:11-14.

21   Pl.'s Stmnt. Undisputed Facts # 15.

22   "[P]icture a drive-thr[o]u[gh] with three different windows. You would want to bring as many people up to the front as you could, then you would want to bring the next wave as far as you could as close to the first wave the cars . . . instead of bringing in one car at a time, you bring in a group." Depo. of John Forgione [Ex. 9] 30:1-30:12. *See also* Barone 28:16-23 (describing the examination of vehicles in waves).

23   Depo. of John Netkovick [Ex. 10] 21:13-22.

24   Netkovick 37:4-8. *See also* Torneo 23:21-24 (describing his usual supervisory activity as "I'll point out violations to other troopers like, hey, that car has got tinted windows or the operator was on the phone or is not wearing a seat belt, things of that nature . . ..").

25   Booker 60:18-23. *See also* Netkovick 42:2-4 ("Everybody can have somebody pulled over there and there would still be room there, because it was a pretty good-sized area.").

26   Barone 28:24-29:6. *See also* Torneo 24:4-6 (explaining that, at checkpoints such as the September 11th one, "if troopers are tied up talking to other cars I may go to a car and speak with the operator").

working the line had interacted with a driver and no further investigation was required, the driver would be released to the interstate and another group would be waved in.[27] The end of the checkpoint, where the last police officers were standing next to traffic cones, was approximately one football field south of where Mr. Picard was protesting on Park Road.[28]

Defendant John Barone was present at entire checkpoint, and was employed by the state police with the job title of trooper first class assigned to the traffic services unit.[29]  Defendant John Jacobi was also present, and was employed by the state police with the job title of sergeant in the traffic services unit.[30]  As a sergeant, Jacobi had supervisory authority over any state police employee with the job title of trooper or trooper first class.[31]  Finally, defendant Patrick Torneo was present, and was employed by the state police with the job of title master sergeant at Troop H,[32] the office covering an area including West Hartford.  Torneo's job title rendered him the most senior supervisor at the checkpoint.[33]

### 1.4    Torneo Gets Advanced Warning of Mr. Picard's Protest

Although Mr. Picard had never met Torneo before the September protest, Torneo had heard of Mr. Picard from a Hartford police supervisor, Robert Allan.  Prior to his retirement from the Hartford police, Allan had the job title of lieutenant in the

---

27  Netkovick 47:23-48:13; Barone 28:16-23; Forgione 30:12.
28  Pl.'s Stmnt. Undisputed Facts # 15.
29  *Id*. # 16.  Barone has since retired from state employment.
30  *Id*. # 17.  Jacobi has also since retired.
31  *Id*. # 18.
32  *Id*. # 19.
33  *Id*. # 20.

traffic division,[34] and conferred with Torneo from time to time about DUI checkpoints and other events posing the risk of snarling traffic in the capital area.[35]

On two occasions between July and September 2015, Allan told Torneo about Mr. Picard and his protests.  On the first occasion, in July, Allan learned that Picard had protested the state police as they conducted a DUI checkpoint near Jennings Road in Hartford.  Afterwards, Allan spoke with Torneo and told him that the Hartford police "had been dealing with Michael . . . for years, that [the state police] were likely being recorded, and we hadn't had any issues with them personally previous."[36]  By "issues," Allan meant that the Hartford police had "set some boundaries, some things we like to see, a mutual respect thing," and that as far as he was concerned, although he disagreed with Mr. Picard's message, "it didn't broach—as far as at our checkpoints, the threshold of being illegal or inciting any kind of—of any charge."[37]

On an occasion after July in the summer of 2015, Allan telephoned Torneo directly to convey his hunch that Mr. Picard was planning a protest for September 11th.[38]  During that call, Allan expressly warned Torneo to "[e]xpect that each of the [protest] members there will be audio and videotaping you."[39]  Allan also told Torneo that Mr. Picard openly carried a firearm.[40]

---

34  Allan 6:5-22.
35  Allan 18:3-11.
36  Pl.'s Stmnt. Undisputed Facts #21.
37  Allan 15:14-21.
38  Pl.'s Stmnt. Undisputed Facts #22.
39  *Id.* #23.
40  *Id.* #24.

### 1.5     The Defendants Decide to Approach Mr. Picard

Sometime around eight in the evening, the defendants left their respective spots at the checkpoint and moved to where Mr. Picard was protesting on Park Road.[41] Jacobi, working upstream of the police interviewing drivers, and Barone, working downstream at the very end of the checkpoint,[42] allege that they did so because they each received an anonymous tip about a man with a gun at Park Road.[43]  Neither undertook any efforts to temporarily detain the alleged tipsters and get any information from them,[44] and neither could describe either tipster or their cars in any detail despite being veteran police officers.  No one else working the checkpoint that night heard the alleged tips.[45]  State trooper Jeff Jalbert accompanied Jacobi and Barone to the protest site on foot,[46] and Torneo drove there.

The Constitutional problems began right away.

### 1.6     Barone Approaches and Stops Mr. Picard from Recording

When Barone approached Mr. Picard, the latter began recording the interaction on his Canon camera.[47]  At four inches wide, an inch thick, and two and a half inches tall–that is, slightly larger than two decks of cards stacked on top of one another–the device looks like a small still photography camera, but can record video and audio.[48]  However, Barone slapped the camera out of Picard's hand, and the camera

---

41  Pl.'s Stmnt. Undisputed Facts #25.
42  *Id.* #26.
43  *Id.* #27.
44  *Id.* # 29.
45  *Id.* # 28.
46  Jacobi 28:8-11.
47  Pl.'s Stmnt. Undisputed Facts # 30.
48  Picard 70:6-7.  Fair and accurate photographs of the camera are attached here as Exhibit 21.  Pl.'s Stmnt. Undisputed Facts # 31.

stopped recording when it hit the ground and the battery dislodged.[49]  The recording ("Video # 1") marked the first time in the evening that Mr. Picard recorded anything.[50]

After swatting the camera to the ground, Barone pat-frisked Mr. Picard and seized his pistol and permit.[51]  Barone did not find anything he deemed contraband, and found no weapons other than the pistol openly displayed in a hip holster.[52]

### 1.8    Barone Takes Away Mr. Picard's Camera

After Barone finished his pat-frisk, he did not handcuff Mr. Picard, tell him that he was being detained, place him under arrest, or instruct him to sit down or stay in one place.[53]  Barone walked twenty to twenty-five feet away to the eastern edge of the triangle, where defendants Jacobi and Torneo were conversing through the driver's window of Torneo's cruiser.  Left alone in the middle of the triangle, Mr. Picard picked up the camera that Barone had swatted to the ground and inspected it for damage.  He put the battery back into the camera and turned the device on to see if it still worked, which it did.

After he began recording again (Video # 3),[54] Mr. Picard aimed it at the three defendants.[55]  Barone walked quickly back to Mr. Picard, grabbed the camera,[56] and told

---

49  Pl.'s Stmnt. Undisputed Facts # 32.
50  *Id.* # 33.  Video # 1 is attached as Ex. 22, has been manually filed, and is a fair and accurate representation of the events captured on it.  *Id.* # 34.
51  *Id.* # 35.
52  *Id.* # 36.  A short distance away, state police employee Jeff Jalbert approached Steve Schafer and pat-frisked him.  Schafer began video-recording as Jalbert approached, and captured some of their interaction (Video # 2).  Video # 2 ends after thirty-six seconds because Schafer's cellphone filled to its storage capacity and stopped recording.  1 Schafer 11:10-25.  Video # 2 was the only recording that Mr. Schafer made that night, *id.* 72:12-19, 97:11-15, and has been attached as Exhibit 23 and manually filed.
53  Pl.'s Stmnt. Undisputed Facts # 37.
54  Picard 118:2-6.  Video # 3 is attached as Exhibit 24 and has been manually filed.
55  Pl.'s Stmnt. Undisputed Facts # 38.
56  *Id.* # 39.

him that "it's illegal to take my picture."[57]  Barone said that Mr. Picard was forbidden to take Barone's picture because Mr. Picard did not "get any documentation" from Barone allowing photography of him.[58]  Barone took Mr. Picard's camera, walked back towards Torneo and Jacobi, yelled "I've got the camera,"[59] and placed it on the roof of Torneo's cruiser.[60]  The camera continued to record video and audio.[61]

Neither Jacobi nor Torneo objected to the camera's seizure, and neither took any action to return the camera to Mr. Picard until the end of their encounter.[62]  The three defendants left Mr. Picard's camera on the roof of the cruiser while they discussed Picard.  None of the defendants examined the camera, searched it, or treated it as evidence.[63]  Barone later admitted in an internal affairs interview that he snatched the camera because he was "frazzled."[64]

### 1.8   The Defendants Discuss Mr. Picard's Protest Activities

As the defendants conversed at Torneo's cruiser, they had little information suggesting that Picard had committed any crime.  None of the defendants saw Mr. Picard anywhere but the triangle that night,[65] and none saw Mr. Picard pull his gun out at any time.[66] All they had were anonymous tips that Jacobi and Barone claimed to have received.

---

57  Pl.'s Stmnt. Undisputed Facts # 40.
58  *Id.* # 41.
59  *Id.* # 42.
60  *Id.* # 43.
61  *Id.* # 44.  The resulting video is a fair and accurate depiction of the events captured on it.  *Id.* # 45.
62  *Id.* # 46.
63  *Id.* # 47.
64  Barone IA 2028:16-17.
65  Pl.'s Stmnt. Undisputed Facts # 48.
66  *Id.* # 49.

Defendants Torneo and Barone verified that Mr. Picard's pistol permit was valid, that his gun was not stolen, and that there were no warrants for his arrest.[67]  That was the extent of the "investigation" into whether Mr. Picard had broken any laws.  No one attempted to corroborate the alleged tips by canvassing other police at the scene.[68]

Instead, Torneo asked someone to "have that Hartford lieutenant call me," so that Torneo could check to see if Mr. Picard "ha[d] any grudges."[69]  Rob Allan, the Hartford lieutenant, does not think that the two spoke that night, but Torneo remembers doing so,[70] and Jacobi remembers overhearing their conversation.[71]  During the conversation, Torneo asked Allan why Mr. Picard "[wa]s challenging us, why he [wa]s challenging these spot checks," and discussed Mr. Picard's past demonstrations with Allan.[72]  Torneo relayed to Jacobi that Mr. Picard had conducted an earlier protest during which "he showed up on the first day of school, with a buddy, and did an armed open carry walk around Hartford,"[73] although had he asked Mr. Picard, he would have learned that no such thing ever occurred.[74]

Barone asked the other defendants "[w]hat's his deal here, do you know?  What does he want?"[75]  He also inquired whether they wanted him to "punch a number on this one," suggesting that "[w]e gotta cover our ass."[76]  Barone later explained that he used the phrase because he bizarrely believed that every time "when you touch somebody, it

_____

67  Pl.'s Stmnt. Undisputed Facts # 50.
68  *Id.* # 51.
69  *Id.* # 52.
70  Tr. of Patrick Torneo Internal Affairs Int. [Ex. 25] 2026:3-11.
71  Jacobi 49:4-12.
72  Pl.'s Stmnt. Undisputed Facts # 53.
73  *Id.* # 54.
74  *Id.* # 55.
75  *Id.* # 56.
76  *Id.* # 57.

means you've got to put–I was always trained, either put them into custody or you've got to write them a ticket."[77]

After the defendants' inquiry about Mr. Picard's pistol permit came back as valid, Jacobi exclaimed, "crap!"[78]  Not satisfied with that result, the defendants "ran him three times, no warrants, no pawns, no nothing."[79]  After a discussion in which Jacobi remarked twice to Torneo that "it's legal to do it," Torneo responded "let's give him *something*," emphasizing the last word.[80]

The defendants then discussed possible charges against Mr. Picard, including simple trespass, reckless use of the highway by a pedestrian, and creating a public disturbance.  During the discussion, Torneo told Jacobi to issue the ticket to Mr. Picard, "then we claim in backup we had multiple motorists stop to complain about" a man with a gun, "but that no one wanted to stop and give a statement,"[81] even though none of the defendants made any effort to detain the alleged tipsters and get a statement.  Jacobi agreed.[82]  Additionally, Torneo can be heard on the video telling Jacobi–Barone's supervisor–to "make sure your guy gives him something."[83]  Barone returned to his cruiser to write up the ticket.

All three later contended that probable cause for the reckless use of the highway charge lay in Mr. Picard's being on the triangle as he protested on the side of Park Road, which they assert was technically part of Interstate 84,[84] though a sign warning pedestrians not to enter the highway was posted some fifty feet south of the island, on

---

77  Pl.'s Stmnt. Undisputed Facts # 58.
78  *Id.* # 59.
79  Barone IA 2038:3-5.
80  Pl.'s Stmnt. Undisputed Facts # 60.
81  *Id.* # 61.  "Backup" is slang for the notes written on a ticket.  Jacobi 56:22-25.
82  Pl.'s Stmnt. Undisputed Facts # 62.
83  *Id.* # 63.
84  Barone 49:8-10; Jacobi 40:9-11; Torneo 46:2-15.

the shoulder of the ramp itself.[85]  As to the public disturbance charge, Torneo identified the probable cause for that as being motorists' reactions to Mssrs. Picard and Schafer: "they have signs, they have open carry weapons, obviously they created enough alarm that it was reported it to us."[86]  Jacobi credited the anonymous tip alone as providing sufficient probable cause for the public disturbance charge.[87]  Barone thought the disturbance charge was appropriate "because this lady told me down there he was waving a gun, holding a sign."[88]

Later, Jacobi admitted that "[w]e didn't directly witness the gun in his hand,"[89] and that none of the defendants knew "for sure whether his hand was on his gun while it was on his hip or if he actually had the gun out of this holster."[90]  When asked whether he possessed any evidence that Mr. Picard had been brandishing a gun, Barone conceded: "Not at all."[91]  And when asked at an internal affairs interview to confirm that he did not think there was evidence to charge Mr. Picard with "waving a hand gun around or brandishing a firearm or creating a public disturbance," Torneo answered: "Correct."[92]

---

85  Picard Decl. ¶ 6.
86  Torneo 43:25-44:2.
87  Jacobi 61:6-17.
88  Barone 60:5-8.
89  Tr. of John Jacobi Internal Affairs Int. [Ex. 26] 2048:4-5.
90  Jacobi IA 2026:17-20.
91  Barone 50:15-17.
92  Torneo IA 2039:17-20.

### 1.9    Mr. Picard Waits on the Triangle

While the defendants discussed Mr. Picard's protest history, he waited on the triangle.  He started recording video while waiting, using his iPhone.[93]  The resulting video (Video # 4) is nine minutes and sixteen seconds long.[94]

Eventually, Torneo decided that he was finished conversing with Barone and Jacobi, and started moving his car towards Park Road in order to turn around.  The motion of Torneo's car flipped Mr. Picard's camera flipped over on the roof, and Torneo stopped to retrieve it, announcing, "shit!"[95]  He turned around, stopped on the island, and handed the camera to Jacobi, announcing that "it's still on."[96]  After a time, Jacobi returned the camera to Mr. Picard.

At that point, Mr. Picard's camera was still recording.[97]  But his camera had automatically turned off its digital viewfinder to conserve battery power, and at first glance Mr. Picard thought that the camera had been powered off.  So he pressed its power button to turn it on.  Because it was already on, the camera shut down, ending Video # 3.[98]  Mr. Picard powered the camera back on and began recording the final video made that night, Video # 5.[99]

When Jacobi and Barone handed Mr. Picard the ticket with his charges on it and gave him his gun back, they ordered him off the island.[100]  Mr. Picard left the island,

---

93  Pl.'s Stmnt. Undisputed Facts # 64.
94  Video # 4 has been included as Exhibit 27 to this motion, and has been manually filed.  It is a fair and accurate depiction of that captured on it.  *Id.* # 65.
95  *Id.* # 66.
96  *Id.* # 67.
97  *Id.* # 68.
98  *Id.* # 69.
99  *Id.* # 70.  Video # 5 has been included as Exhibit 28 to this motion, and has been manually filed.  Video # 5 is a fair and accurate depiction of that captured on it.  *Id.* # 71.
100 *Id.* # 72.

ending the parties' interactions.  The total length of their encounter was around thirty minutes.[101]

### 1.10   Mr. Picard Goes Home and Discovers the Videos

Mr. Picard left the Park Road protest for home at 11PM.[102]  It was only once home that he discovered Video # 3 on his camera, in the very early hours of September 12th.  He discovered it when he removed the SD card[103] from his Canon camera and inserted it into the SD card slot on his home computer.[104]

There were a total of five videos recorded during the parties' interactions on the side of Park Road that night.[105]  Four were recorded by Mr. Picard, and one (Video # 2) was recorded by Mr. Schafer.[106]  Within a few days, Mssrs. Picard and Schafer began discussing combining clips from the five videos into a sort of highlight reel to post online.  Mr. Picard decided to produce two such composite videos; one shorter and one longer.  Mr. Picard had some experience stitching together video footage and posting it online; he had done so with footage of some prior checkpoint protests.  He owned a copy of Adobe, Inc.'s Premiere Pro–a piece of video editing software–for that purpose.

Although he had been watching Videos ## 1, 3, and 5 directly from the SD card inserted in his computer, Mr. Picard decided in the wee hours of September 12th to copy the videos to his home computer, which he did by dragging and dropping them to a place on his home computer's hard drive.[107]  Then he went to bed.

---

101 Pl.'s Stmnt. Undisputed Facts # 73.
102 *Id.* # 74.
103 SD card stands for "Secure Digital card."  SD cards are removable devices the size of a postage stamp that function as a hard drive with no moving parts.
104 Pl.'s Stmnt. Undisputed Facts # 75.
105 *Id.* # 76.
106 *Id.* # 77.
107 *Id.* # 78.

Later that day, Mr. Picard obtained a copy of the lone video recorded by Mr. Schafer at the protest, Video # 2.[108]  Mr. Picard made a number of copies of all five videos on his hard drive, by dragging and dropping the files to different locations.[109]  Not having any knowledge of digital forensics, he did not cordon off a set of so-called "camera original" files.  Instead, he imported a set of all five videos into Adobe Premiere to begin making his composite highlight reels, which caused the software to add a snippet of application metadata to each file.[110]  He did not add or delete any video footage to or from the five files filed in support of this motion.[111]

A few days after September 12th, Mr. Picard finished the short and long composite videos.  He waited until January 2016 to publish them online,[112] however, because he feared that doing so during the initial phases of his criminal case would cause state prosecutors to retaliate against him.  The longer version intercut scenes of Mr. Picard's September protest with ones from prior protests; the shorter one was drawn solely from the five September source videos.

### 1.11   The Criminal Charges Against Mr. Picard are Dismissed

The charges laid on Mr. Picard caused a criminal proceeding to be started against him in the Connecticut Superior Court.[113]  After his initial appearance, and through counsel, Mr. Picard moved for a bill of particulars; when the prosecution filed its superseding long-form information on May 4, 2016, it omitted the public disturbance

---

108 Pl.'s Stmnt. Undisputed Facts # 79.
109 *Id.* # 80.
110 Application metadata is information that a software application creates and stores within a digital file.
111 Pl.'s Stmnt. Undisputed Facts # 81.
112 *See* Michael Picard, *"Gotta Cover our ass." - Connecticut State Police (Full)*, https://www.youtube.com/watch?v=kxSHMbZcdcE (Jan. 25, 2016) (the longer composite video); Michael Picard, *"Gotta Cover Our Ass." - Connecticut State Police*, https://www.youtube.com/watch?v=Aizm05nCVkE (Jan. 25, 2016) (the shorter one).
113 Pl.'s Stmnt. Undisputed Facts # 82.

charge and thus dropped it.  Two months later, the prosecution dismissed the remaining

charge–reckless use of a highway by a pedestrian–by entering a *nolle prosequi*, ending

the case without a conviction on any count.[114]

Mr. Picard filed this suit in September 2016 [ECF # 1], alleging that the

defendants' actions violated his First Amendment right to receive and

memorialize information (Count 1); his Fourth Amendment right against warrantless

seizure of his camera (Count 2); and his First Amendment right to document and

protest government activity (Count 3).


**2.      Forbidding Mr. Picard to Photo- or Videograph Defendants Doing Their Jobs in Plain View on a Roadside Contravened Mr. Picard's First Amendment Right to Gather Publicly Available Information**

In Count One of his complaint, Mr. Picard contends that the defendants violated

his First Amendment right to receive information when they twice forbade him from

recording their images with his camera.  Because settled law protected his ability to

photo- or videograph what any passing pedestrian or motorist could observe with their

own senses, the defendants broke the law by enacting a one-person prohibition by fiat.

The First Amendment's right to speak or publish carries with it a concomitant

right to gather or receive information.  *E.g., Martin v. City of Struthers*, 319 U.S. 141,

143 (1943).  The First Amendment reception right stems from a belief that thought is the

cradle of speech, so that the two are treated as a "matrix, the indispensable condition, of

nearly every other form of freedom."  *Palko v. Connecticut*, 302 U.S. 319, 326-27 (1937),

overruled on other grounds, *Benton v. Maryland*, 395 U.S. 784, 794 (1969).  The "right

to read or observe what [one] pleases"–whether socially valuable data or just that which

---

114 Pl.'s Stmt. Undisputed Facts # 83.

satisfies "intellectual and emotional needs"–is fundamental, so that "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Stanley v. Georgia*, 394 U.S. 557, 564-5, 568 (1969).

The First Amendment "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw," because a ban on gathering facts is tantamount to one on expressing opinions. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). "[B]anning photography or note-taking at a public event would raise serious First Amendment concerns; a law of that sort would obviously affect the right to publish the resulting photograph or disseminate a report derived from the notes." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012). *See also Los Angeles Police Dep't v. United Reporting Publ'g*, 528 U.S. 32, 42 (1999) (Scalia, J., concurring) (explaining that would be little constitutional difference between a restriction on speech and one denying access to information for "persons who want to use the information for certain speech purposes"); *Western Watersheds Project v. Michael*, 869 F.3d 1189, 1197 (10th Cir. 2017) (holding that statute forbidding entry onto otherwise-accessible lands for those collecting data relating to ecosystem health impairs First Amendment speech-creation).

Nonetheless, the undisputed facts before the Court demonstrate that the defendants twice curtailed Mr. Picard's ability to gather information about what was happening to his protest. First, Barone slapped Mr. Picard's camera to the ground when he approached the plaintiff, in a transparent effort to deny him the opportunity to make an independent factual record of the encounter. Then, once Mr. Picard put his camera back together and resumed recording, Barone took it away for the duration of the

encounter, complaining that he objected to being recorded.  Neither Torneo nor Jacobi

undertook any efforts to stop the seizure, or to return the camera to Mr. Picard.

Against the established principle of the First Amendment "bar[ring] the

government from dictating what we see or read or speak or hear," *Ashcroft v. Free*

*Speech Coalition*, 535 U.S. 234, 245 (2002), the defendants here must grasp at one of

two things to justify their forbidding Mr. Picard to photograph public servants working

on a public roadside.  They may contend that (1) the novelty of using a digital camera to

record publicly perceptible images or sounds renders composition of the photo or video

beyond First Amendment protection; or (2) the presence of public employees

transforms a publicly perceptible occurrence into contraband.  Neither is true.

### 2.1 The Advent of Digital Cameras Did Not Overrule Settled Law Protecting People's Ability to Capture Publicly Perceptible Sights and Sounds

The existing First Amendment protections for Mr. Picard to memorialize

what was happening to him on the side of Park Road did not dissipate when he used a

digital camera instead of, say, a Polaroid and a tape recorder.  "[T]he basic principles of

freedom of speech and the press, like the First Amendment's command, do not vary

when a new and different medium for communication appears."  *Brown v.*

*Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) (internal quotation omitted).

*Accord, e.g., Superior Films v. Ohio Dep't of Educ.*, 346 U.S. 587, 589 (1954) (Douglas,

J., concurring) ("[T]he First Amendment draws no distinction between the various

methods of communicating ideas . . . [t]he movie, like the public speech, radio, or

television is transitory—here now and gone in an instant.").  The Amendment's

protections apply to every imaginable medium of communication, from computer

games, *Brown*,  564 U.S. at 790, to videos, *United States v. Stevens*, 559 U.S. 460, 468 (2010), computer-generated images, *Free Speech Coalition*, 535 U.S. 234, 244 (2002), photographs, *Tunick v. Safir*, 228 F.3d 135, 137 (2d Cir. 2000), films, *Kingsley Int'l Pictures v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 689-90 (1959), music, *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989), and paintings.  *Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996).

So, if Mr. Picard had dialed his mother and began telling her what happened while standing alone on the island as the defendants conversed twenty-five feet away, it would be absurd for the defendants to claim that they could have forced him to hang up, or taken away his phone so as to prevent him from verbalizing his version of events.  If Mr. Picard had whipped out a small notebook (or composed an electronic note to himself on his phone) to write down salient details like the defendants' names and badge numbers, the defendants would unquestionably be in the wrong to snatch the notebook or phone.  And if Mr. Picard had pulled out a sketchbook to draw a diagram of the scene, the same result would follow.  There is no viable distinction to be drawn between a digital camera and any other method of memorialization.

Beyond that, a public employee claiming that a technological change silently overrules existing constitutional law runs afoul of our circuit's admonitions against assessing a right by the novelty of the device used to exercise or extinguish the right. For example, in *Edrei v. Maguire*, the court of appeals turned aside a qualified immunity defense from police who inflicted hearing pain and damage on peaceful protesters by means of a purpose-built long-range electronic device.  The police, focusing on "the mode of delivery rather than the physical effect" of the device, claimed that a lack of case law addressing the specific device at issue meant that they could not

be held accountable for its use.  892 F.3d at 543.  But the circuit disagreed, explaining
that "novel technology, without more, does not entitle" a defendant to skirt the
constitution.  *Id.* at 542.  Instead, courts must assess the effect of a technology in order
to determine whether its use is governed by existing case law.  *Id.* at 543 (analyzing the
device's effect of pain and incapacitation as a use of force under existing Fourth
Amendment teachings).  *See also Terebesi v. Torreso*, 764 F.3d 217, 236 (2d Cir. 2014)
(analyzing stun grenades in accordance with their effect of "a blinding flash of light and
a deafening explosion" over the defendants' claims that no case had yet addressed the
precise explosives at issue).

      In this dispute, that analysis is easy: Mr. Picard's digital camera recorded images
and sounds of public employees doing their jobs on a public roadside.  The capture of
both visual images and the spoken word enjoy First Amendment protection on their
own; the coincidence of the two sits under the same constitutional umbrella.

### 2.2    The Presence of Public Employees Doing Their Jobs Does Not Transform Publicly Perceptible Words and Images into Forbidden Pictures or Sounds

      Because the technological details of Mr. Picard's recording method are
immaterial to the First Amendment, the defendants may be tempted to argue that the
dispositive detail is the recording of a government employee, as against recording any
other publicly perceptible subject matter.  But to succeed on a theory that receiving a
government paycheck renders one unrecordable, the defendants here must convince the
Court that, as between two images of the same scene plainly perceptible to anyone
passing by on Park Road, photo- or videography of one with the police in it could be

forbidden without violating the First Amendment.  Such a defense would require the

Court to conclude, for example, that the image on the left[115] is protected while the image

on the right[116] is not because it includes the police in addition to the very same roadside:

 

That would of course be preposterous.  In First Amendment terms, a person may

not be penalized for capturing images or sound that he can see with his eyes or hear with

his ears if those sights and sounds are emitted in a public place.  "There is an undoubted

right to gather news from any source by means within the law," *Houchins v. KQED, Inc.*,

438 U.S. 1, 11 (1978) (internal quotation omitted), subject only to neutral time, place,

and manner restrictions compatible with the location at which the information is being

gathered.  *See Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (listing examples of

permissible restrictions in controlled settings); *see also*, *e.g.*, *Zalaski v. City of*

*Bridgeport*, 613 F.3d 336, 341 (2d Cir. 2010) (identifying burden of government when

115 Video # 4 at 0:11.
116 Video # 4 at 0:10.

seeking to enforce limits on streets and sidewalks).[117]  There were no such restrictions applicable to Park Road as Mr. Picard stood aside it on the night of his protest.

Worse for would-be video censors, to date, courts have identified just one image that Americans may not compose, record, or possess in any fashion outside of their own heads: child pornography depicting actual children.  In fashioning that exception, the supreme court rested its analysis on the reality that "the use of children as subjects of pornographic materials" necessarily means that such images cannot be created without children being abused.  *New York v. Ferber*, 458 U.S. 747, 758 (1982).

Notably, the court has refused to cut further categories of images from the First Amendment's protection.  In *Ashcroft v. Free Speech Coalition*, it struck, on First Amendment grounds, a statute forbidding creation of any image that "appears to be" child pornography even if produced using young-looking adults or image-generation software, as well as any depiction "advertised . . . [or] described . . . in such a manner that conveys the impression" of it being child pornography regardless of whether it was.  535 U.S. 234, 241-2 (2002) (internal quotations omitted).  *Ferber*'s identification of the single prohibited image category, the court explained, "was based on how it was made, not on what it communicated," holding that an image "that records no crime and creates no victims by its production" garners First Amendment protection.  *Id.* at 250-1.  *See also Stevens*, 559 U.S. at 472 (striking statute prohibiting possession of animal cruelty depictions made for commercial gain, and holding that *Ferber* did not establish "a freewheeling authority to declare new categories" of forbidden information).

There is no serious argument that pictures of state employees performing their jobs on the side of a road, in plain view of the motoring public, ever fall into the narrow

---

117 The right to receive information inures to all; it is not more favorable to journalists than non-journalists.  *E.g., Branzburg*, 408 U.S. at 684 (collecting cases).

category of unprotected images.  Mr. Picard–like anyone else who happened by that night–could lawfully perceive the defendants doing their jobs in the open.  By the same token, had defendants witnessed Mr. Picard handling contraband while standing on the side of Park Road, they would not have been prohibited from acting upon what was nakedly visible.  *E.g.*, *United States v. $557,933.89*, 287 F.3d 66, 81 (2d Cir. 2002) (explaining that the plain view doctrine excuses necessity of a warrant for an object so long as police have "viewed the object from a lawful vantage point").

Moreover, publicly perceptible information about how public servants do their jobs is not only *not* forbidden, but has long fostered society's "paramount" interest in knowing what its government is up to.  *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964). In recognition of that interest, circuit courts have for decades ruled that the government may not prohibit the memorialization of what public servants do in plain view when discharging their job duties.  *Turner v. Driver*, 848 F.3d 678, 688–89 (5th Cir. 2017); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597-8 (7th Cir. 2012); *Glik v. Cunliffe*, 655 F.3d 78, 79-81 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Schnell v. City of Chicago*, 407 F.2d 1084, 1086 (7th Cir. 1969).

In sum, neither the fact of public servants being in the depiction of a publicly perceptible scene, nor the use of a digital camera to capture that scene, renders the defendants' actions lawful.  The defendants forbade Mr. Picard's recording because they preferred there not be an objective record of the happenings next to Park Road. Judgment must therefore enter in Mr. Picard's favor on Count One.

**3.     Judgment Should Enter as to Count Two, Because the Defendants' Confiscation of Mr. Picard's Camera Was Unjustified, and Unconnected to any Investigation of Its Contents**

As relevant to Count 2 of the complaint, the Fourth Amendment guaranteed Mr. Picard the right "to be secure in [his] . . . effects, against unreasonable . . . seizures." The Amendment's protections govern any meaningful governmental interruption of a person's possessory interest in an object, however brief, *United States v. Jacobsen*, 466 U.S. 109, 113, 113 n.5 (1984), and regardless of whether the object is searched. *Soldal v. Cook County*, 506 U.S. 56, 62-64 (1992). On the record of this case, there are only two avenues by which the defendants could have taken Mr. Picard's camera away from him without violating the Fourth Amendment. Most obviously, they might have obtained a warrant for its seizure upon demonstrating probable cause, but they did not.

Alternatively, they could have temporarily seized the camera in anticipation of obtaining a search warrant if they had reasonable articulable suspicion to believe that the camera "contain[ed] contraband or evidence of a crime." *United States v. Place*, 462 U.S. 696, 702 (1983) (applying the principles of a *Terry* stop of a person to the investigatory detention of an object). In order for such a seizure to be lawful, the public employee's "'action [must have been] justified at its inception,'" and the seizure must have been "'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Hooper*, 935 F.2d 484, 493 (2d Cir. 1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The seizure of Mr. Picard's camera was neither, and so the defendants are liable to Mr. Picard on Count Two.

### 3.1 The Camera's Seizure Was Not Justified at Its Inception Because the Camera Was Unconnected to Criminal Activity

The first prong of *Place* asks whether the public employee's seizure of an object was justified at its inception.  In order to satisfy this inquiry, the government defendant must prove that "at the point of seizure, [he] had at least a reasonable suspicion based on specific articulable facts" that the object contained, or was itself, contraband, *Hooper*, 935 F.2d at 493, or that the object was, or contained, evidence of crime.  *Place*, 462 U.S. at 702.  In Barone's own words, there was only one rationale for taking Mr. Picard's camera: because it was purportedly "illegal to take my picture."[118]  But Connecticut has no criminal prohibition against possessing a camera, or against photography of public servants performing their job duties in public.  Mr. Picard's camera therefore was neither contraband nor evidence of a non-existent photography crime.  Inescapably, the camera's seizure was not justified.

At all relevant times to this dispute, there was no Connecticut statute forbidding Mr. Picard from either possessing a camera, or from photographing public employees working in plain view on the side of a street.[119]  Without a statute to point to, the defendants might be expected to claim that they merely *thought* that state law forbade possession of a camera, or the photography of government employees working on public streets.  But an abysmal familiarity with Connecticut's criminal code cannot forestall judgment.  On occasion, a government employee's mistaken understanding of the law

---

118 "[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent *that that intent has been conveyed to the person* confronted," *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988) (emphasis added), so Barone is bound by what he admittedly told Mr. Picard was the reason for snatching the camera.

119 To the contrary: two months before the parties' encounter, Connecticut's governor signed a bill creating a private right of action for an aggrieved photographer or videographer whenever police "interfere[] with any person taking a photographic or digital still or video image of such p[olice] officer or another p[olice] officer acting in the performance of such p[olice] officer's duties."  2015 Conn. Acts 1636-1637 (codified at Conn. Gen. Stat. § 52-571j(b)) (effective Oct. 1, 2015).

can give rise to reasonable suspicion of criminality. *Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014). However, the Fourth Amendment "tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable." *Id.* So, close calls interpreting confusing motor vehicle or criminal statutes may come within *Heien*'s ambit. *See id.* at 540 (traffic stop for one non-functional taillight reasonable mistake where applicable statutes referred to a "stop lamp" in the singular, but also required cars to "have all originally equipped rear lamps . . . in good working order") (internal quotations omitted); *United States v. Diaz*, 122 F. Supp. 3d 165, 175 (S.D.N.Y. 2015) (reasonable mistake of law to interpret apartment stairwell as covered by open container law where statutory language was very broad, and state courts had split on its scope).

Where the law plainly does not address the conduct at issue, *Heien* offers no assistance to government employees who get it wrong by imagining offenses. This Court, for example, held that *Heien* does not create the basis for inventing a narcotic offense out of marijuana possession when the statute relied upon by the government fails to list marijuana as a narcotic. *United States v. Hampton*, No. 17-cr-84, 2018 WL 340024, at *3 (D. Conn. Jan. 9, 2018). And the Seventh Circuit held that *Heien* could not create reasonable suspicion for the traffic offense of failing to signal when parking at a curb, where the Illinois statute relied on did not address parking. *United States v. Stanbridge*, 813 F.3d 1032, 1037-8 (7th Cir. 2016). The Sixth Circuit held *Heien* to be of no assistance to police who stopped and frisked a man openly carrying a firearm even though Ohio law has no prohibition against open carry. *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1132 (6th Cir. 2015). The Fifth Circuit held that *Heien* did not salvage a traffic stop for a driver's allegedly violating a turn signal statute that did

not apply to the lane-change the driver made.  *United States v. Alvarado-Zarza*, 782 F.3d 246, 250 (5th Cir. 2015).  And the Southern District held that *Heien* works no alchemy for police who stopped a motorist having two functional taillights and a burnt-out center high-mounted brake light, because the New York traffic code only required two brake lights.  *United States v. Mota*, 155 F. Supp. 3d 461, 474 (S.D.N.Y. 2016).

Such is the situation here for the defendants.  No law prohibited Mr. Picard from using his camera on a public street, or from taking the picture of public employees working in public.  So they should "gain no Fourth Amendment advantage through a sloppy study of the laws [they are] duty-bound to enforce," *Heien*, 135 S. Ct. at 539–40, and cannot claim reasonable suspicion of the camera being a prohibited item or evidence of a non-existent photography offense.  The seizure was not justified at its inception.

### 3.2    The Seizure of Mr. Picard's Camera Bore No Relation Whatsoever to the Defendants' Investigation of Mr. Picard

The second criterion that an investigatory object seizure must satisfy is its relation to the reasons for the seizure.  In order to pass muster, such a seizure must be "reasonably related in scope to the circumstances which justified it initially." *Hooper*, 935 F.2d at 494 (internal quotation omitted).  The relationship of the seizure's intrusiveness to the suspicion used to justify it is a required element of the analysis because "[t]he reasonableness requirement of the Fourth Amendment applies not only to prevent . . . seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of . . . seizures that are carried out." *Ayeni v. Mottola*, 35 F.3d 680, 684 (2d Cir. 1994).  Investigatory object seizures are only

permitted upon reasonable suspicion, so the permissible level of government intrusion occasioned by the seizure is quite low: only "minimally intrusive." *Place*, 462 U.S. at 706. For any seizure more intrusive than a minimal one, the government needs probable cause. *E.g.*, *$557,933.89*, 287 F.3d at 86. Hence, if a seizure is completely unrelated to any reasonable suspicion existing at the outset of the seizure, or imposes a sufficiently serious hardship upon the object's owner, it is unconstitutional. The undisputed facts of this litigation demonstrate that the defendants seized Mr. Picard's camera but never undertook any investigation to prove or disprove any suspicions about the device. The seizure was therefore unrelated in scope to any justification that may have existed for taking the device, and was unlawful as a result.

An illustrative example of how a purposeless, punitive seizure fails to meet *Place* comes from the Sixth Circuit. In *Bennett v. City of Eastpointe*, that court was faced with a number of Fourth Amendment claims stemming from the defendant suburb's practice of stopping young Black bicyclists who rode across the city line from Detroit. 410 F.3d 810, 819-824 (6th Cir. 2005) (recapping each incident at issue). In one such incident, the police lawfully stopped the plaintiffs for riding two to a bike in violation of Michigan's traffic code. *Id*. at 824. The police checked the boys' bikes' serial numbers against a stolen bike database, which verified that the bikes were not stolen. *Id*. at 823. But instead of releasing the bikes, the police took the bikes and told the boys that they could pick their bikes up at the police station upon "proof of ownership or a statement from a parent or guardian regarding ownership." *Id*. at 825. The defendant municipality eventually sold the bikes at auction. *Id*. at 824.

The Sixth Circuit assumed without deciding that brief seizure of the bikes in order to check their serial numbers was justified at its inception by reasonable

suspicion.  *Id.* at 826.  But the court held that detention beyond that point was unrelated in scope to the initial justification, as there was "no justifiable purpose" for holding the bikes further.  *Id.*  In support, the court pointed to the fact that the police purportedly held the bikes to perform further investigation, yet the record contained "no indication . . . that the [police] officers ever investigated further."  *Id.*  The failure to perform any investigation on the seized bikes unconstitutionally "reversed the onus under the Fourth Amendment and placed the burden on the youths to demonstrate that the bikes were not stolen."  *Id.*

The defendants here committed the same Fourth Amendment violation when they took Mr. Picard's camera and did nothing with it.  Whatever the initial justification of the camera's seizure (and there was none), what happened to the camera afterwards must have been reasonably related in scope to that justification in order to be lawful. *Hooper*, 935 F.2d at 494.  But just as in *Bennett*, the defendants in this case undertook zero investigative effort after seizing the object, leaving it upside-down on the roof of a police car and not treating it as evidence or examining it in any way.  The seizure had "no justifiable purpose," *Bennett*, 410 F.3d at 826, and was purely a punitive confiscation.

Confirmation of that conclusion comes from our own circuit's teachings on purposeless seizures.  In *Lauro v. Charles*, the Second Circuit held that staged "perp walks"–in which an arrestee is paraded in front of news media–are not reasonably related in scope to the initial seizure of the suspect and are therefore unconstitutional. 219 F.3d 202, 213 (2d Cir. 2000).  In that case, John Lauro was arrested and booked at a municipal police station for a variety of minor property offenses.  *Id.* at 204.  Two hours after his arrival at the station, the police called the news media to the station house and

then had an employee take Lauro out of the station, drive him around the block, and walk him back into the station, handcuffed, in front of photographers.  *Id*.  Lauro later sued, contending that the forced march violated his Fourth Amendment rights.  The Second Circuit agreed with him after analyzing the situation as a *Terry* stop.  *Id*. at 211-212.  The court held that the seizure caused by forcing Lauro out of the police station, around the block, and back into the police station past the media "lacked any legitimate law enforcement purpose," and was therefore not related to the justification for seizing Lauro in the first place, *i.e.*, his booking.  *Id*. at 213.  The Fourth Amendment injury, explained the court, was that the perp walk "exacerbat[ed] Lauro's seizure" while being "unrelated to the object of [his] arrest" and having "no purpose."  *Id*.

Here, Mr. Picard suffered precisely the same Fourth Amendment injury when his camera was taken.  Whatever the justification was for taking the camera in the first place, its detention on top of a state police police cruiser served no purpose, as evidenced by the defendants' complete ignorance of the device after snatching it.  Judgment should therefore enter for Mr. Picard on Count Two.

### 5.    Conclusion

In this case, three state police employees wished to prevent a critical protester from making an objective record of the way they were treating him, so they took away his camera and dumped it upside-down on the roof of a police car until they were done hassling him.  When they did so, they violated settled law protecting the protester's ability to video- or photograph civil servants doing their jobs in public.  They also abrogated the protester's right against having his property confiscated by the

government absent reasonable suspicion.  Judgment should therefore enter for the

plaintiff on Counts One and Two.

| | |
|---|---|
| ___/s/ Dan Barrett___ | __/s/ Joseph R. Sastre__ |
| Dan Barrett (# ct29816) | Joseph R. Sastre (# ct28621) |
| ACLU Foundation of Connecticut | The Law Office of Joseph R. Sastre, LLC |
| 765 Asylum Avenue, 1st Floor | 67 Chestnut Street |
| Hartford, CT 06105 | Bristol, CT 06010 |
| (860) 471-8471 | (860) 261-5643 |
| e-filings@acluct.org | joseph.sastre@gmail.com |

*Counsel for Mr. Picard*

**Certificate of Service**

I certify that a copy of foregoing and all of its attachments and exhibits (other than those manually filed) was filed electronically on April 12, 2019. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____ /s/ Dan Barrett _____

**Plaintiff's D. Conn. Local R. 56(a)(1)
Statement of Undisputed Material Facts**

| # | fact | source |
|---|------|--------|
| 1 | On the evening of September 11, 2015, Mr. Picard and Steve Schafer stood on the side of Park Road in West Hartford protesting a DUI checkpoint. | Depo. of Michael Picard [Ex. 1] 33:5-10; 1 Stephen Schafer [Ex. 2] 120:6-8. |
| 2 | The checkpoint was operated by the state police. | Answer [ECF # 10] ¶ 15. |
| 3 | Mr. Picard displayed two signs during his protest: one read "Cops Ahead," while the other read "Stay Calm and Remain Silent." | Picard 78:12-21. |
| 4 | Mr. Schafer had a smartphone with him, and Mr. Picard had a smartphone as well as a camera. | 1 Schafer 10-11:25, Picard 47:25-48:3. |
| 5 | Mr. Picard also carried a pistol in a holster on his right hip. | Picard 48:2-3, 49:15-16. |
| 6 | Mr. Picard had his valid pistol permit with him. | Picard 119:12-21, Depo. of Patrick Torneo [Ex. 3] 34:16-18. |
| 7 | Mr. Picard stood on a raised triangle on the south side of Park Road. | Picard 151:9-20. |
| 8 | The triangle on which Mr. Picard was protesting had one edge running straight east-west along Park Road, and two edges curve into a point facing south towards the I-84 on-ramp. | Complaint Ex. A. |
| 9 | Exhibit A to the Complaint is a fair and accurate aerial depiction of the triangle on which Mr. Picard stood. | Decl. of Michael Picard [Ex. 4] ¶ 2. |

| 10 | The triangle was raised above the pavement and surrounded by curbs.  Its edges were marked by yellow reflectors mounted on steel posts, and it had a telephone pole on its long edge running along Park Road. | Picard Decl. ¶ 3. |
|---|---|---|
| 11 | In the center of the triangle was a large green reflective road sign mounted on two metal poles bearing the red and blue Interstate 84 shield, an arrow pointing towards the access road, and the words "Hartford" and "Waterbury." | Picard Decl. ¶ 4. |
| 12 | Exhibit B to the Complaint is a fair and accurate depiction of the triangle on which Mr. Picard stood, although the picture lacks the yellow reflectors on posts that were on the edges of the triangle. | Picard Decl. ¶ 5. |
| 13 | While protesting, Mr. Picard stayed along the long edge of the island, walking no further right on the photo above that the leftmost post of the I-84 sign. | Picard 151:17-152:7. |
| 14 | While protesting, Mr. Picard did not set foot off the triangle until after the defendants forced him to leave it. | Picard 47:14-17 (testifying that he went to the gore upon arriving at the protest); *id.* 133:1-6 (recounting that defendants forced him to leave it). |

| | | |
|---|---|---|
| 15 | The first police officer working at the checkpoint was standing approximately 120 fee from Mr. Picard, while the most downstream one stood about 300 feet away. | Depo. of Jeffrey Jalbert [Ex. 7] 15:4-18 (identifying Jacobi as thirty or forty yards from Park Road); Booker 47:4-14 (end of checkpoint 100 yards from Park Road); Depo. of John Barone [Ex. 8] 57:16-24 (same). |
| 16 | Defendant John Barone was present at the checkpoint, and was employed by the state police with the job title of trooper first class. | Barone 7:8-16. |
| 17 | Defendant John Jacobi was present, and was employed by the state police with the job title of sergeant. | Depo. of John Jacobi [Ex. 11] 8:6-20. |
| 18 | As a sergeant, Jacobi had supervisory authority over any state police employee with the job title of trooper or trooper first class. | Jacobi 25:23-25. |
| 19 | Defendant Patrick Torneo was present, and was employed by the state police with the job of title master sergeant. | Torneo 20:9-16; Jacobi 20:7-14. |
| 20 | Torneo's job title rendered him the most senior supervisor at the checkpoint. | Torneo 20:20-15; Jacobi 20:10-18. |
| 21 | On two occasions before Sep. 11th, retired Hartford police supervisor Robert Allan told Defendant Torneo about Mr. Picard and his protests. | Depo. of Robert Allan [Ex. 12] 15:3-8. |

| 22 | On an occasion after July in the summer of 2015, Allan telephoned Torneo and told him that Mr. Picard was planning a protest for September 11th. | Allan 36:1-10, 37:15-19. |
|---|---|---|
| 23 | During that call, Allan expressly warned Torneo that at a September 11th protest, Mr. Picard would be audio- and video-recording. | Allan 38:2-4. |
| 24 | During that call, Allan told Torneo that Mr. Picard openly carried a firearm. | Allan 37:10-13. |
| 25 | Sometime around eight in the evening, the defendants left their respective spots at the checkpoint and moved to where Mr. Picard was protesting on Park Road. | *See* Picard 33:8-10 (protest start time around 6:45PM); Picard 8-10 (Barone approached him about an hour and twenty minutes after that). |
| 26 | At the time that they decided to move towards Mr. Picard, Jacobi was working near the state police blood alcohol testing truck ("BAT mobile"), and Barone was working downstream at the very end of the checkpoint. | Jacobi 26:10-14; Barone 26:25-27:1. |
| 27 | Jacobi and Barone allege that they moved to Mr. Picard's protest spot because they each received an anonymous tip about a man with a gun at Park Road. | Jacobi 26:17-20; Barone 33:15-18. |

| 28 | No other police officer at the checkpoint, including Torneo, heard any anonymous tip. | Torneo 29:3-4; Depo. of Henry Arroyo [Ex. 13] 9:7-19 (has no recollection at all of the checkpoint); Depo. of Michael Belton [Ex. 14] 12:12-17; Booker 72:9-13 (heard about it from another cop); Depo. of Kevin Dowe [Ex. 15] 29:1-10; Depo. of Marlon Drummond [Ex. 16] 39:8-10; Jeffrey Duda 47:4-8; Depo. of Samuel Ferrucci [Ex. 17] at 6:13-19, 9:8-10:2 (although roster showed him working that evening, has no recollection of being present); Forgione 48:9-20 (did not hear any motorist report criminal activity); Jalbert 17:8-12; Netcovick 52:20-53:7 (heard it from other cops); Depo. of Jonathan Owens [Ex. 18] 9:23-25; Depo. of Jeffrey Swank [Ex. 19] 16:8-14 (did not hear about criminal activity). |

| 29 | Neither Jacobi nor Barone undertook any efforts to temporarily detain the alleged tipsters and get any information from them. | Jacobi 25:8-12, 27:19-28:3, 44:17-19; Barone 35:12-13; Tr. of John Barone Internal Affairs Int. [Ex. 20] 2025:7-10. |
| --- | --- | --- |
| 30 | When Barone approached Mr. Picard, the latter began recording the interaction on his Canon camera. | Picard 69:5-6; 70:2-7. |
| 31 | Ex. 21 comprises fair and accurate depictions of Mr. Picard's Canon camera. | Picard Decl. ¶ 7. |
| 32 | Barone slapped the camera out of Picard's hand, and the camera stopped recording when it hit the ground and the battery dislodged. | Picard 118:15-20. |
| 33 | The resulting recording ("Video # 1") was the first time that evening that Mr. Picard recorded anything. | Picard 69:24-70:1. |
| 34 | Video # 1 is a fair and accurate representation of that which is captured on it. | Picard Decl. ¶ 8. |
| 35 | Barone pat-frisked Mr. Picard and seized his pistol and permit. | Barone 41:14-42:7. |
| 36 | Barone did not find anything he deemed contraband, and found no weapons other than the pistol openly displayed in a hip holster. | Barone 42:1-5. |
| 37 | Barone did not handcuff Mr. Picard, tell him that he was being detained, place him under arrest, or instruct him to sit down or stay in one place. | Ans. ¶ 46 (admitting). |

| 38 | Mr. Picard turned his camera back on and aimed it at the three defendants. | Picard 120:2-5; Ans. ¶ 49 (admitting). |
|---|---|---|
| 39 | Barone walked quickly back to Mr. Picard and grabbed the camera. | Ans. ¶¶ 49, 50 (admitting). |
| 40 | Barone told Mr. Picard that "it's illegal to take my picture." | Ans. ¶ 50 (admitting). |
| 41 | Barone told Picard that he was forbidden to take Barone's picture because he did not "get any documentation" from Barone allowing photography of him. | Ans. ¶ 51 (admitting). |
| 42 | Barone took Mr. Picard's camera, walked back towards Torneo and Jacobi and yelled "I've got the camera." | Video # 3 [Ex. 24] at 0:22. |
| 43 | Barone placed it on the roof of Torneo's cruiser. | Ans. ¶ 56 (admitting). |
| 44 | The camera continued to record video and audio (Video # 3). | *See* Video # 3 at 0:22-09:32. |
| 45 | Video # 3 is a fair and accurate depiction of that which is captured on it. | Picard Decl. ¶ 9; Barone 24:6-19; Jacobi 16:11-17:5; Torneo 18:8-19:5. |
| 46 | Neither Jacobi nor Torneo objected to the camera's seizure, and neither took any action to return the camera to Mr. Picard until the end of their encounter. | Ans. ¶ 57 (admitting). |
| 47 | None of the defendants examined the camera, searched it, or treated it as evidence. | Ans. ¶ 59 (admitting). |

| 48 | None of the defendants saw Mr. Picard anywhere but the triangle that night. | Barone 38:24-39:4; Jacobi 41:7-14.  *See also* Torneo 48:9-15 (testifying that he never saw Picard in the road). |
|---|---|---|
| 49 | None of the defendants saw Mr. Picard pull his gun out at any time. | Torneo 44:19-23; Barone 47:22-18:3; Jacobi 34:13-15. |
| 50 | Defendants Torneo and Barone verified that Mr. Picard's pistol permit was valid, that his gun was not stolen, and that there were no warrants for his arrest. | Barone 46:3-11. |
| 51 | None of the defendants corroborated the alleged tips by canvassing potential witnesses. | Barone 48:10-14.  Accord Torneo 36:1-8 (testifying that he did not witness Jacobi or Barone conduct any investigation beyond speaking with Mr. Picard). Belton 13:12-15:3; Booker 76:6-16; Drummond 39:21-40:14; Duda 50:7-24; Forgione 47:2-5; Jalbert 25:15-26:7; Netkovick 72:10-16; Owens 10:4-11; Swank 22:23-25. |

| | | |
|---|---|---|
| 52 | Torneo asked someone to "have that Hartford lieutenant call me," so that Torneo could check to see if Mr. Picard "ha[d] any grudges." | Video # 3 at 1:22; Ans. ¶ 63 (admitting). |
| 53 | Torneo asked the Hartford lieutenant, Rob Allan, why Mr. Picard "[wa]s challenging us, why he [wa]s challenging these spot checks," and discussed Mr. Picard's past demonstrations with Allan. | Torneo 41:1-5, 37:24-38:3. |
| 54 | Torneo understood from Allan that Mr. Picard had conducted a protest during which "he showed up on the first day of school, with a buddy, and did an armed open carry walk around Hartford." | Video # 3 at 4:28; Torneo 41:10-12. |
| 55 | No such demonstration ever occurred. | Picard Decl. ¶ 10. |
| 56 | Barone asked the other defendants "[w]hat's his deal here, do you know?  What does he want?" | Video # 3 at 1:44. |
| 57 | Barone asked the other defendants whether they wanted him to "punch a number on this one," suggesting that "[w]e gotta cover our ass." | Video # 3 at 2:12; Ans. ¶ 66 (admitting). |
| 58 | Barone used the phrase "cover our ass" because he believed that every time "when you touch somebody, it means you've got to put–I was always trained, either put them into custody or you've got to write them a ticket." | Barone IA 2034:1-7. |
| 59 | After the defendants' inquiry about Mr. Picard's pistol permit came back as valid, Jacobi exclaimed, "crap!" | Video # 3 at 4:47. |

| 60 | Torneo told Jacobi, "let's give him something," emphasizing the last word. | Video # 3 at 4:41. |
| 61 | Torneo told Jacobi to issue the ticket to Mr. Picard, "then we claim in backup we had multiple motorists stopped to complain about" a man with a gun, but "they didn't want to stay and give us a statement." | Video # 3 at 05:18; Answer ¶ 74 (admitting). |
| 62 | Jacobi agreed. | Answer ¶ 75 (admitting). |
| 63 | Torneo told Jacobi to "make sure your guy gives him something." | Video # 3 at 5:21. |
| 64 | While the defendants had possession of his camera, Mr. Picard began recording on his iPhone ("Video # 4). | Picard Decl. ¶ 11. |
| 65 | Video # 4 is a fair and accurate depiction of that captured on it. | Picard Decl. ¶ 12. |
| 66 | When Torneo turned his car around, the motion of the car flipped Mr. Picard's camera flipped over on the roof, and Torneo stopped to retrieve it.  Upon discovering it, Torneo uttered "shit!" | Video # 3 at 6:22-6:38. |
| 67 | Torneo handed the camera to Jacobi, announcing that "it's still on." | Video # 3 at 7:30. |
| 68 | When Jacobi returned the camera to Mr. Picard, it was still recording. | Video # 3 at 9:20-9:28. |
| 69 | Mr. Picard thought that the camera had been powered off.  So he pressed its power button to turn it on.  Because it was already on, the camera shut down, ending Video # 3. | Picard Decl. ¶ 13. |

| 70 | Mr. Picard powered the camera back on began recording ("Video # 5"). | Picard Decl. ¶ 14. |
| 71 | Video # 5 is a fair and accurate depiction of that captured by it. | Picard Decl. ¶ 15. |
| 72 | When Jacobi and Barone handed Mr. Picard the ticket with his charges on it and gave him his gun back, they ordered him off the island. | Picard 133:3-6. |
| 73 | The total length of their encounter was around thirty minutes. | Picard 147:4-11. |
| 74 | Mr. Picard left the scene of his protest at 11PM. | Picard 136:2-4. |
| 75 | Mr. Picard discovered the existence of Video # 3 in the early morning hours of September 12th when he removed the SD card from his camera and inserted it into the SD card slot on his home computer. | Picard Decl. ¶ 16. |
| 76 | There were a total of five videos recorded during the parties' interactions on the side of Park Road that night. | Picard 147:22-25. |
| 77 | Four were recorded by Mr. Picard, and one ("Video # 2") was recorded by Mr. Schafer. | Picard 148:1-20. |
| 78 | Mr. Picard decided on September 12th to copy the videos to his home computer, which he did by dragging and dropping them to a place on his home computer's hard drive. | Picard Decl. ¶ 17. |
| 79 | Later that day, Mr. Picard obtained a copy of the lone video recorded by Mr. Schafer at the protest, Video # 2. | 1 Schafer 11:18-12:3; Picard Decl. ¶ 18. |

| | | |
|---|---|---|
| 80 | Mr. Picard made a number of copies of all five videos on his hard drive, by dragging and dropping the files to different locations. | Picard Decl. ¶ 19. |
| 81 | Mr. Picard did not add or delete any video footage to or from the five files filed in support of his motion. | Picard Decl. ¶ 20. |
| 82 | The ticket given to Mr. Picard by the defendants commenced a criminal proceeding against Mr. Picard in the Connecticut Superior Court. | Picard Decl. ¶ 21. |
| 83 | Both charges given to him by the defendants were dismissed by the prosecution, and the criminal case ended without a conviction on any count. | Picard Decl. ¶ 22. |